CREYTS *v.* CREYTS.

1. DIVORCE—EXTREME CRUELTY—CONDONATION.
   The fact that, after being cruelly treated, a wife continues to live with her husband for several years, in the hope of receiving proper treatment, in which she is disappointed, will not prevent her from relying on the original cruelty in a suit for divorce.

2. SAME—EVIDENCE.
   Evidence examined, and *held* to entitle a wife to a divorce on the ground of extreme cruelty.

Appeal from Ingham; Wiest, J. Submitted February 20, 1903. (Docket No. 60.) Decided April 21, 1903.

Bill by Carrie L. Creyts against John Creyts for a divorce. From a decree dismissing the bill, complainant appeals. Reversed.

*Rollin H. Person,* for complainant.

*L. B. & H. M. Gardner,* for defendant.

CARPENTER, J.  Complainant appeals to this court from a decree dismissing her bill of complaint, asking for a divorce from defendant on the ground of extreme cruelty. The parties to this suit were married August 21, 1894.  At that time complainant was 24 years of age, and defendant 53.  The defendant was a wealthy farmer, residing in the township of Watertown, Clinton county.  He was a widower, and the father of five children, ranging in age from 20 to 17 years.  By an antenuptial agreement he promised that complainant should have out of his estate, if she survived him, in satisfaction of her dower and statutory rights, $3,000, which should be increased to $4,000 in case defendant lived 10 years after their marriage.  It was also agreed that complainant and defendant should permit the children of the latter—except the oldest child, who lived in the city—to reside on the farm, while they should take up their residence in the city of Lansing. Shortly after the marriage, and while complainant and defendant were on their wedding trip, defendant made an unfortunate investment.  In consequence of this, it was decided that they would not go to the city to live, but would take up their home with the children by his former marriage.

Less than a year after the marriage was contracted, it was discovered that the complainant was about to become a mother.  This was regarded as a personal grievance by the children of defendant living at home.  According to their testimony, they "felt hard about it;" they "didn't think it was right." . It is very clear that they made known their feelings to complainant, and defendant told complainant that he felt sorry for them.  A short time before the child was born, defendant's children met at the house of complainant and defendant, to discuss and determine what complainant's condition required her and defendant to do, and defendant compelled complainant to be present at this conference.  Complainant refused to accede to the request of the children to move to a tenant house, and finally prevailed upon the defendant to tell his

children that he and his wife would remain, and, if "they could not put up with things as they were," they might leave, but "they remained." Complainant and defendant continued to reside on the farm until 1898. It was certainly a most unhappy home. She and defendant's daughters often quarreled. When she appealed to defendant, he would say: "I know nothing about this trouble; you will have to settle it between yourselves."

In the fall of 1898 complainant and defendant removed to the city of Lansing. In June, 1900, a serious, but not dangerous, surgical operation was performed on complainant. While she was recovering from this operation, and still in bed, the little daughter of complainant and defendant, then about four years old, was permitted to visit a neighbor's house one afternoon. She did not return speedily, as she had promised, and complainant became very anxious, and urged that the child be sent for. Defendant refused, saying that the child had promised to come home, and he was going to see how long she would stay. At 9 o'clock the child was brought home, and, when defendant saw her coming, he turned out the lights and locked the doors, and refused to admit her, notwithstanding her screams. Complainant was nervous and worried, and in a helpless condition, but not until she threatened to get out of bed herself and open the door would defendant admit the child to its home. During this same illness of complainant, defendant did other things to provoke and annoy her. On one occasion, complainant's brother-in-law, the husband of her sister, visited her, and, in defendant's presence, kissed her. After he had gone, defendant—who finds no fault in his conduct—lay down on the lounge and said, "O, how I would like to embrace your sister ! How I would like to kiss her !" repeating this statement several times in a sarcastic tone.

About five weeks after this operation, complainant, in consequence of the treatment already referred to, and other similar treatment, decided to leave defendant. She took her child and went to the house of defendant's brother,

and, while waiting there for a carriage to carry her to her father's home, defendant drove up and carried the child away. Whether or not he intended to deprive complainant of the child, as he had threatened, is uncertain; but complainant thought, and had a right to think, that was his purpose. After some time spent in finding defendant, by driving around town with a livery rig, complainant, by a display of force, recovered her child. After staying home about four weeks, complainant, at defendant's inter-cession, again resumed marital relations with him.

About the last of September, 1900, defendant, while attending the fair at Grand Rapids, got injured in a fight with the police of that city. He came home shortly after, and, while being treated for his ailments there, without any adequate cause whatever, became angry at complainant, left his home, and went to the hospital. He stayed there only a day or so, and, complaining that the food was not good enough for him, and that it was not warm enough, he went to the Hotel Wentworth, and refused for several days to comply with complainant's urgent request to return home.

On the 15th of October, 1900, occurred the last and final difficulty. Defendant, without giving any reason therefor, demanded of complainant their marriage certificate. She, thinking that he wanted the same for some improper purpose, and desiring to preserve it, refused to grant his request, and went and locked herself in the room where it was. He commanded her to open the door, and on her refusal he violently pounded the door with a piece of gaspipe until he broke the lock.

These are the salient charges made in the bill and established by the testimony. The testimony, too, establishes other charges, of a more flagrant character, not specified in the bill, and we think it creditable to complainant that she did not specify them. While we will not grant relief because of those latter charges, they prevent our believing that defendant's general good conduct compensated for the wrongful conduct complained of.

In reaching these conclusions we are not aware that we violate the principle, often asserted by this court, of assuming that the trial judge, having a superior opportunity of passing upon the credibility of witnesses, has determined the questions of fact correctly. We infer from the carefully prepared opinion of the learned circuit judge in this case that he found the facts substantially as we find them, and that he dismissed complainant's bill because he did not think these facts amounted to such extreme cruelty as justified a divorce.

It is suggested that compelling complainant to be present at the conference when her condition of motherhood was discussed by defendant's children was not intolerable, because she continued to live with defendant for several years thereafter. She had a right to overlook this wanton cruelty, in hopes that his subsequent conduct would be proper. If it was not, if she was subjected to other cruelty in her domestic life, there is no reason why she should not, in the proof of her grievances, rely upon this as one of her charges.

It is said that the turning of the lock and refusing to admit into its home the four-year-old baby of complainant and defendant was not cruel; that this was a method of correction that the father might properly adopt, and any injury resulting was caused by complainant's oversensitiveness and desire to interfere. If it is true that this was a proper method of punishing the child, it is none the less true that the time and method both were well calculated to grievously wound the feelings of the sick mother and to retard her recovery. A mother who resents such a method of punishment does not display oversensitiveness or an improper desire to interfere. If she did not resent it, and was not affected by it, it might well be argued that she lacked qualities essential to a good mother.

It is insisted that there was nothing cruel in the display of force when the door was broken in to obtain the marriage certificate, because no legal harm could have resulted from its destruction. This contention implies that the

only reason complainant had for resisting defendant's attempt to obtain possession of the certificate was the fear that its destruction would cast some doubt on the validity of their marriage. We do not so understand her testimony. While it clearly appears that she was justified by defendant's conduct in believing, and did believe, that he wished the certificate for an improper purpose, it must be admitted that she has not given a very clear statement of her reasons for resisting his demand. Neither is this strange. It is almost impossible to state these reasons in words, but we know what they are. The sentiments of complainant's sex, better than any words, inform us what her reasons were. We may know judicially that every wife desires to preserve her marriage certificate. Her right of dominion over that document is universally regarded. She regards it as one of her most cherished possessions, and when her husband demands it in a manner which indicates his intention to damage it, destroy it, or make any other improper use of it, we know, better than we or she can explain, why she feels impelled to frustrate him. If it is true, as claimed by defendant, that he wanted to look at this certificate for the purpose of seeing whether there was any mistake in its date, he should have stated his purpose. He did not state that purpose, and complainant was justified, under the circumstances, in believing, as she did, his purpose to be improper, and in resisting him.

As an offset to these charges, it is suggested that complainant moved the portrait of defendant's first wife from its place in her parlor, and put it in the storeroom; that she removed the memorial card and the plate taken from the first wife's coffin, which occupied a prominent place in the parlor, and put them in a trunk upstairs. Her reason for this act, which seems to defendant to have been so improper, was that the eyes of the dead wife seemed always to be on her when she lay upon the lounge, sick, in the room. It is suggested that she might have moved the lounge. This is no answer, because it appears from the

testimony that the portrait had this not uncommon characteristic: Its eyes seemed to rest upon and follow whoever was in sight of it. It is not discreditable to the complainant that she removed this portrait and the mournful reminders of the death of the first wife from the conspicuous place they occupied in her parlor; but it is discreditable to the defendant that, notwithstanding this removal, and complainant's reasons therefor, he insisted upon returning the portrait to the place it formerly occupied.

It is also said that complainant did not show proper affection for defendant's children. The specifications of this charge are these: That she refused to permit defendant's youngest daughter to live with them after they removed from the farm, and that she expressed hatred for one of his sons. The treatment she had received from this daughter justified complainant in this refusal. Complainant did dislike one of defendant's sons, and had expressed her dislike in forcible language to her dressmaker. She certainly had no occasion to love this son. It was he who had suggested that complainant and her husband leave their home and go to the tenant house, because she was in the family way. Though entertaining this dislike, it is proper to note that she made no display of her feelings, and but one witness testifies to hearing her express them. Defendant certainly was not grieved by this expression of complainant's feeling. It does not appear that he ever knew of it. Nor would he have been grieved had he known it. His own affection for this son, a grown man, did not prevent his turning him from his home just before he married complainant, and once thereafter.

The suggestions that complainant paraded her troubles before the neighbors more than was seemly, that she is not so meek as one might infer from her claim, and that she testified to many charges which are trivial in character, do not disentitle her to relief.

The decree of the court below will be reversed, and a decree entered here granting complainant a divorce, and giving her the custody of her child. She should also

receive a proper allowance for alimony, and for the expenses of this suit, if defendant has not already paid them. We shall not at this time undertake to determine the amount of such allowance, for two reasons: The record is not in a satisfactory shape to enable us to do that, and this is a matter which the parties themselves should be able to adjust. If they are unable to do that, it may be made the subject of a future application, and we will make such order as may be necessary.

The other Justices concurred.