TIFFIN v. TIFFIN.

1. DIVORCE—DECREE—APPEAL AND ERROR—DUTY OF SUPREME COURT TO PASS UPON EVIDENCE ON APPEAL.

While the Supreme Court ought not lightly to reverse a decree in a suit for divorce, where the chancellor has seen and heard the witnesses, and has had the advantage of determining their credibility, nevertheless it is not thereby relieved of the duty of exercising its own judgment in passing upon the evidence in the case.

2. SAME.

In divorce proceedings, on appeal from a decree dismissing the bill of plaintiff wife, evidence, *held*, not to sustain the finding of the court below that the parties were equally to blame.

3. SAME—EXTREME CRUELTY—PERSONAL VIOLENCE.

Where it is undisputed that defendant husband was guilty of repeated acts of personal violence, amounting to extreme cruelty, decree will be granted to the wife, although she has not been entirely blameless.

4. SAME—CONDONATION—EVIDENCE—SUFFICIENCY.

An attempted reconciliation and resumption of marital relations after the filing of the original bill, *held*, under the evidence, not to amount to condonation of defendant's wrongful conduct on the part of plaintiff.

5. SAME—ALIMONY.

Where defendant's property consists of an apartment building worth from $17,000 to $20,000, with a mortgage against it of $6,500, and he owes about $2,500 besides, plaintiff is

---

On sufficiency of evidence to establish condonation of cruelty, see note in 6 B. R. C. 626.

The question of money decree for permanent alimony or a separate maintenance as a lien on real property is discussed in a note in 25 L. R. A. (N. S.) 132; L. R. A. 1916B, 651.

awarded permanent alimony in the sum of $5,000 in lieu of dower, also costs, including an attorney fee of $150, all to be a lien upon defendant's property until paid, under the circumstances an award being preferable to an undivided interest in the property.

Appeal from Wayne; Perkins (Willis B.), J., presiding. Submitted January 8, 1920. (Docket No. 33.) Decided February 27, 1920.

Bill by Phigenia A. Tiffin against Walter E. Tiffin for a divorce. From a decree dismissing the bill, plaintiff appeals. Reversed, and decree entered.

*George P. Palmer*, for plaintiff.

*Walter M. Trevor*, for defendant.

STONE, J. The bill of complaint herein was filed by the wife, on February 6, 1915, to obtain a divorce from the husband on the grounds of extreme cruelty and failure to support. The bill charges the defendant with personal violence and many other marital offenses. These charges are all denied by the defendant in his answer, and claiming the benefit of a cross-bill he charged plaintiff with extreme cruelty, refusal to perform her duties as a housewife and with many acts of marital misconduct. After the filing of the original bill, the parties resumed marital relations for a time under an attempted reconciliation, but it is claimed in and by a supplemental bill, which was filed November 12, 1915, that the conduct of the defendant was such that plaintiff found it impossible to further live with him, and the case proceeded to a hearing.

The defendant is a practicing physician in the city of Detroit. The parties were first married on September 16, 1891, while defendant was a student of medicine in the Detroit College of Medicine, and it appears that by mutual consent the parties did not live together, and plaintiff returned to the home of her parents in the Province of Ontario.

Subsequently, the defendant graduated in his course of medicine, commenced the practice of his profession in Detroit, and a second marriage ceremony was performed on November 17, 1896, after which time the parties cohabited as husband and wife continuously until a short time before the filing of the original bill of complaint.

The record is a large one, and in both the pleadings and the testimony of the parties there is much of acrimony, consisting of accusation and counter accusation. In fact it is seldom that a record shows so much of crimination and recrimination by the parties as is here shown. A fair sample of this bitterness is shown in that part of defendant's answer and cross-bill wherein he says of the plaintiff:

"She has no sense of propriety nor truth, and is a most unmitigated liar."

We have read the entire record with great care, and have duly considered it, but we are of the opinion that no possible good could follow the spreading of the differences of the parties upon the pages of the reports of this court. The record shows much incompatibility, but we think it shows much more.

After the hearing the trial court, evidently with some reluctance, announced its conclusion as follows:

"In considering the whole case I believe that justice will be subserved by separating these parties, granting to the plaintiff the relief prayed, and awarding her as permanent alimony the sum of $2,000 and costs to be taxed, together with a solicitor's fee of $100."

Subsequently a rehearing was granted, and further testimony was taken as to the value of the defendant's property, the plaintiff having prayed for permanent alimony. About a dozen witnesses, mostly real estate dealers, were examined in June, 1918, upon the subject of the value of defendant's property—No. 1870

Woodward avenue. Later, and on June 28, 1918, the trial judge filed a memorandum opinion in which he reached the conclusion that relief should be denied to both parties. He said:

"To grant a decree to one may work an injustice to the other. To arbitrarily divide the property between them may likewise be inequitable. Such an adjustment was attempted, in the suggestions made in the opinion already filed. These suggestions have met the distinct and emphatic disapproval of both parties. Under these circumstances, and following the usual rule, both parties being equally to blame for the conditions complained of, the bill of complaint and the cross-bill in this case will be dismissed, and it is so ordered."

A decree was entered accordingly. The plaintiff has appealed.

We recognize the rule that this court ought not to lightly reverse a decree, where the chancellor has seen and heard the witnesses, and has had the advantage of determining their credibility; nevertheless we are not thereby relieved of the duty of exercising our own judgment in passing upon the evidence in the case.

A careful consideration of the evidence has led us to differ from the opinion of the trial court that the parties are equally to blame. The extravagant charges contained in defendant's cross-bill have not been supported by any testimony save his own, in many important instances. By this we do not mean to hold that under the testimony the plaintiff has been entirely blameless. That she has been imprudent appears by her own cross-examination. That the defendant has been guilty of repeated acts of personal violence, amounting to extreme cruelty, is undisputed. Immediately before the filing of the original bill the following incident occurred, which was described by plaintiff as follows:

"On the 31st of January, 1915, after I had come

home from church and was providing my own food, I had prepared my dinner, and set it on the table in the kitchen—he came out and asked if I expected him to eat a meal. Occasionally he would get his breakfast there himself. I don't remember what answer I made him, but I do remember that he rushed at me right and left, struck me over the head, and I raised up to defend myself as good as I could, and he shoved me against the window and broke the windowpane out, and when he satisfied himself on me, stood against the wall and asked me if I had had enough, and I said, 'Well, you are a low dirty pup.' He rushed at me again and pounded me again. There was an empty bottle standing on the table, and I grabbed that and threw over his head, and he threw me down on the floor, and sat on my back and put his hands on my back, until the prints of his fingers were on my skin for several days. He has not charged this as an assault on him, and that is the way it occurred."

The defendant in his testimony gave this version of the transaction:

"I judge that she wanted some grounds for divorce; she thought I would strike her. She mentions the fact that I struck her, and this is how it was. She was getting her breakfast, or I was, I don't know which, but anyway, I gave her a good shove with my fist, and shoved her right over to the other side of the kitchen table. She picked up a milk bottle and cut my head open with it. In grabbing her I don't know whether I grabbed her to prevent her striking me again, but I caught her around here (indicating), threw her on the floor and held her there until she promised she would behave. I didn't strike her. I didn't touch her outside of holding her, *only the first shove*. She promised to behave and I let her up, and learned afterwards she ran out of the door and across to the church, and told a policeman about it. I heard it. However, she went upstairs, she hadn't been to church that morning, she said she had. She went upstairs and stayed there the rest of the day. The next morning or some time after that, she filed this bill for divorce. She had understood and I had un-

derstood, it was impossible for us to live together, the way we were living."

Earl W. Watson, a young man about 21 years of age, testified to the following conduct of the defendant in 1909:

"I roomed and boarded at Dr. Tiffin's residence. I took lunch where I worked, but generally had breakfast, and dinner there in the evening. There was no servant kept in the Tiffin house when I was there. Mrs. Tiffin did the usual work of the house. * * * I have eaten a number of meals in the house, and the treatment that Dr. Tiffin gave his wife, in my estimation, was very bad. I have seen him treat her with contempt, and throwing sarcastic remarks at her without any provocation at all on her part. I have seen him throw a dish of gravy in her face, breaking up the meal. I absolutely saw him throw gravy in her face. I didn't see any provocation for that. There were some words that preceded this, but I cannot recall the words that led up to it. It was a number of years ago. I know it was really started by Dr. Tiffin. I left rooming there because I didn't like it. I didn't think Dr. Tiffin was treating his wife right, and we were not wanted around there; simply moved. My brother was with me at this time."

We shall refrain from copying further testimony. We are of the opinion that plaintiff is entitled to a decree of divorce upon the ground of personal violence amounting to extreme cruelty. As this court said in *Utley* v. *Utley*, 155 Mich. 258, we repeat here:

"We are impressed that the parties should be relieved entirely of the relations entered upon with their marriage, and that a disposition of the property should be made which will render personal relations of any kind unnecessary and unlikely to occur."

The parties have drifted so far apart, and such bitterness of feeling exists between them, that we are satisfied they can never live together in any proper manner. Under the evidence in the case we do not

think that defendant's conduct, above referred to, has been condoned by plaintiff. *Austin* v. *Austin,* 172 Mich, 620; *Creyts* v. *Creyts,* 133 Mich. 4; *Creech* v. *Creech,* 126 Mich. 267; *Eistedt* v. *Eistedt,* 187 Mich. 371; *Hazelton* v. *Hazelton,* 162 Mich. 192.

The property of the defendant—all accumulated after the marriage—consists of an apartment building known as 1870 Woodward avenue, Detroit. The title to this property is in defendant. The defendant testified that the lot and building cost him $12,000 some years ago—about 1906. The testimony of the witnesses as to the value of this property in 1918 varied widely. Our best judgment is that its value is from $17,000 to $20,000. There is a mortgage upon it of $6,500 and the defendant owes about $2,500 besides. The plaintiff asks that this real estate be divided between the parties, subject to a part of the mortgage. We think that this would be impracticable for the reasons stated. All personal relations should be severed, in our opinion.

We think that a decree from the bonds of matrimony should be granted to the plaintiff; that she should be awarded permanent alimony in the sum of $5,000, to be paid by the defendant within four months from the date of the decree of this court, the said amount to be and constitute a lien upon all of the real estate of the defendant, including the said premises; which award and allowance shall be in lieu of dower of the plaintiff in the property of the defendant, and in full satisfaction of all claims which the plaintiff may have in any property which the defendant owns or may hereafter own, or may have an interest in. In our opinion such award is preferable to an undivided interest in the property. It is better for both parties. Plaintiff has some property and means of her own, and she can protect her lien against the mortgage as well or better than she could her interest, if she owned

an undivided part subject to the mortgage. Plaintiff will be awarded the costs of both courts, including an attorney or counsel fee of $250, which will be in full of all attorney fees, and the same will be a lien upon defendant's property until paid.

The decree of the circuit court will be reversed, and one entered here in accordance with this opinion.

MOORE, C. J., and STEERE, BROOKE, FELLOWS, CLARK, BIRD, and SHARPE, JJ., concurred.