## GILLBERG v. GILLBERG.

1. DIVORCE — EVIDENCE — PLEADINGS IN FORMER SUITS — ADMISSIBILITY.
    In a suit for divorce by a wife, the pleadings in former divorce suits between the plaintiff and her former husband and defendant and his former wife are not competent evidence of the issue involved in this suit.

2. SAME—EXTREME CRUELTY—EVIDENCE—SUFFICIENCY.
    Evidence held, sufficient to justify granting plaintiff a divorce on the ground of extreme cruelty.

3. SAME—ALIMONY.
    Testimony as to defendant's income and the value of his property, held, not to warrant this court in modifying an award of $17,000 to plaintiff and $10 per week for the support of a minor child, in addition to the costs and a solicitor's fee of $150.

Appeal from Wayne; Davis (Frank D. M.), J., presiding. Submitted April 8, 1920. (Docket No. 22.) Decided June 7, 1920.

Bill by Vouwie B. Gillberg against Gustave S. Gillberg for a divorce. From a decree for plaintiff, defendant appeals. Affirmed.

*Dohany & Dohany*, for plaintiff.

*Edward H. Kennedy*, for defendant.

MOORE, C. J. This is a divorce proceeding. The case was heard in open court. The trial judge expressed himself in part as follows:

"I find from the testimony in this case that it appears beyond all question of dispute, even by the admissions of the defendant, that he was guilty of cruelty to the plaintiff in this case. In all my experience of 45 years at the bar and upon the bench, and being acquainted quite fully with the character of many of the nationalities that have become American citizens, I never yet, in all my experience have seen a case where a man was possessed of such a desire to practice cruelty upon a wife. * * * A woman about to become a mother, in the eyes of the husband—even in the eyes of the South Sea Islander—is treated with respect, and it remains for a man who professes to be a civilized American to practice that cruelty this man has practiced upon this woman. * * *

"Now as to the property matters, this woman has not lived with him many years and has not helped him to acquire all the property he has, but he has brought this child into the world, he has married this woman, he has placed her in about as bad a condition as a man knows how to place a woman, has broken her pride, humiliated her; he has bruised her and abused her, and he ought to pay her a fair amount in lieu of dower. I think the statute has been in force a good many years which holds she should have dower the same as though he were dead. Now in lieu of dower, it ought to be a reasonable sum. I am inclined

to think plaintiff's counsel has asked for a rather high amount in view of all the circumstances. On the other hand, the amount admitted by the defendant's counsel in case divorce is granted is rather low. I am inclined to fix the sum at $17,000 this man should pay, and I think if he pays $10 per week to the support of that child, it is a small amount, a reasonable amount, and I shall leave that matter open for the further order of the court in case the necessities require a larger amount. He is a man possessed of quite a large amount of property, a man physically and mentally equipped for the battle of life, and can take care of the child properly, and capable of earning a good income, and the cost of the case will be taxed against the defendant, including solicitor's fee of $150."

A decree was entered accordingly. The case is brought here by appeal.

The record discloses the following:

"*Mr. Pokorny:* I wish to offer in evidence circuit court file 55,039, case of Duncan Malcolm Patton *v.* Vouwie B. Patton; also chancery court file number 55,038, case of Gertrude Gillberg *v.* Gustave S. Gillberg, which seem to have been filed almost simultaneously, not far apart.

"*Mr. Charles E. Dohany:* I have no objection if they are of any value to your honor.

"*The Court:* What is there about it any more than the fact they were divorced?

"*Mr. Pokorny:* It sets up the relations of the parties prior to their marriage. Like to have the record show when these parties first met both of them were married and had families, and as a result of that, you might say, immoral meeting, it resulted in the breaking up of two homes and brought about the marriage.

"*The Court:* Can he question that, inasmuch as he is one of the guilty parties?

"*Mr. Pokorny:* Only in so far, your honor, as it might affect the division of the property, if the court reaches that conclusion.

"*The Court:* The immorality of either one, if known to the other one before marriage, of course, can't affect the rights as to divorce.

"*Mr. Pokorny:* We don't raise that question here. The pleadings do show there was a reconciliation since this bill was filed and we stand on that proposition."

Much of the brief of appellant is devoted to a discussion of the averments contained in the pleadings in those two cases. We cannot see how these pleadings can in any view of the case be competent evidence of the issues involved here. Appellant's counsel have a brief of 23 printed pages. We have read it with care and do not find in it anywhere a statement that plaintiff has failed to show upon the merits a cause for divorce. We shall quote but little of the testimony.

The plaintiff testified in part, when speaking of their life on defendant's yacht:

"As soon as Jack left the boat, Gillberg got me down in the cabin and closed the door and said he was going to finish me. I wore earrings at that time, fastened through the ears. He knocked me up against the side of the cabin and knocked my head back and forth, tried to pull my earring out; pulled in such a way my ear bled; I was dressed in white and I was all covered with blood. The blood ran down my garments. While he was doing that, he wanted me to get down on my knees to him. He called me names. He asked me to get down on my knees three or four times. He called me a God damn whore. Said I was a sport. He called me that many times, in the presence of my daughter. He called me names of that character in the presence of my thirteen-year-old daughter, so many times I couldn't tell. That little girl is in school. She is in the seventh grade; graduates this year. He called me those names in the presence of Jack. When he pulled this earring and caused my ear to bleed, he otherwise injured me; just beat me and knocked me over."

In another part of her testimony when she was speaking of a visit to a saloon she testified:

"He remained in this barroom until almost midnight. I asked a waiter to go in and ask him to come

back, it was getting so late, I had to get across the bridge before the bridge closed; at midnight the bridge would be closed and I had no place to go. I had no home in Detroit then; no means with which to provide myself with a room. He did not come out when the waiter went after him. I finally had to go in after him. I got him. When I got him, he was very much intoxicated. I got him out of the building. Our automobile was standing, then, about a block away from Mesta's place, on the boulevard across Jefferson. We got to the automobile; he said he would take me across. I got in the rear seat. He also got in the rear seat. As soon as he got into the rear seat he took hold of my neck, started to pull my head down, said he was going to break my neck for me because I came in and got him there. He took hold with both hands; pulled me down to the bottom of the car. He called me vile names. Swore at me. At that time, Mr. Gillberg was in the Swedish massage business. He worked at it himself when he was there. He is a very muscular man. He don't really know his strength; don't know how hard he did. He got me in the back of my neck, tried to pull my neck over. He wasn't trying to get me to do anything—just—he was so intoxicated he was mean. He told me then I should get out of the machine, and finally he did get me out and drove away and left me standing, a little after midnight then. I was standing up on the sidewalk when he got in the front seat and drove away. I was pregnant then, two months. He knew it. The effect of this assault on me was to make me very, very nervous."

She gave much other testimony of similar treatment.

Defendant was a witness and gave his version in relation to the occurrences mentioned in the testimony of the plaintiff. Much of his testimony served to confirm the testimony of the plaintiff. His testimony alone makes a clear case of cruel treatment on his part that would justify granting the plaintiff a divorce.

The only other question having merit is: Did the

court allow too large an amount as alimony. The plaintiff claims she is a physical wreck caused by the cruel treatment of the defendant. The parties are not agreed as to the income of the defendant. Plaintiff worked for a time in the office of the defendant in the Penobscot building and testified his income was $1,000 a month. The defendant put an accountant on the stand who testified the books of defendant showed a net profit from defendant's business in 1917 of $2,326.35, and for 1918 of $3,278.28, while the defendant claims there was a loss of $4,000 in 1917, and a loss of $3,000 in 1918. Defendant admitted receipts of $243 a month from rents of real estate owned by him.

The record shows defendant owns real estate at the corner of Lafayette and Eighth street in Detroit, on which there are six brick veneered buildings.

Plaintiff gave testimony tending to show the value of this real estate was $60,000. Defendant's witnesses placed the value of the land alone at $35,000, but put no value upon the buildings. There is an incumbrance of $12,000 on this real estate.

Plaintiff claims defendant owned oil stock, Canadian real estate, Mexican timber land, an automobile worth $1,600, and that he has an interest in his father's estate. We think it problematical whether this property last named, aside from the automobile, is so certainly shown to have value that it should enter into the basis for fixing alimony. Taking all the testimony, however, bearing upon the questions of defendant's income and the value of his property, we are not constrained to modify the amount awarded as alimony. See *Kiplinger* v. *Kiplinger*, 172 Mich. 552; *Rieden* v. *Rieden*, 206 Mich. 550; *Tiffin* v. *Tiffin*, 209 Mich. 232.

The decree is affirmed, with costs to the plaintiff.

STEERE, BROOKE, FELLOWS, STONE, CLARK, BIRD, and SHARPE, JJ., concurred.